IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

BRIAN MOLDOVER,

                        Defendant.

CRIMINAL ACTION
NO. 14-637

## OPINION

**Slomsky, J.**                                                    **November 13, 2020**

## I.    INTRODUCTION

Defendant Brian Moldover ("Defendant"), who is serving a 192-month sentence, moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). Defendant requests a modification of his sentence to time served, asserting that the COVID-19 pandemic, his underlying health conditions, and the conditions at his prison place him at an increased risk of harm from the virus. Defendant also asserts that the recent grant of compassionate release for similarly situated defendants and his personal characteristics together amount to extraordinary and compelling circumstances justifying his release. The Government opposes Defendant's Motion, citing the insufficiency of COVID-19 risk factors in his medical records, numerous measures the Bureau of Prisons ("BOP") has implemented to prevent the spread of COVID-19 in its facilities, and the severity of Defendant's underlying offenses. For reasons that follow, Defendant's Motion will be denied.

## II.     BACKGROUND

### A.  Defendant's Prior Convictions

On January 26, 2005, Defendant was sentenced in the Northern District of California to fifty months' imprisonment followed by ten years' supervised release for possession and transportation of child pornography.  (Doc. No. 30 at 2.)   On October 24, 2007, Defendant's supervised release was transferred to the U.S. Probation Office for the Eastern District of Pennsylvania.  (Id. at 3.)  As a condition of his supervised release, Defendant could possess a device with Internet access only if it served an employment or educational purpose and he obtained the advance approval of the U.S. Probation Office to allow for monitoring through computer monitoring software.  (Id.)

On July 3, 2014, the computer monitoring software installed on Defendant's laptop indicated that Defendant had recently received repair services on an iPhone 5 cellular phone that had not been reported to the U.S. Probation Office.  (Id.)  On July 8, 2014, as a result of that information, a warrant was issued to search Defendant's residence.  (Id.)  This search revealed numerous, unapproved devices in Defendant's possession containing approximately 1,125 images of child pornography.  (Id. at 3-4.)  Defendant obtained these images—fifteen total videos[1]—from minor children over the Internet by posing as a minor child.  (Id. at 4-5.)  As a result of this violation of his supervised release, Defendant was resentenced to a twelve-month term of imprisonment.  (Id. at 4.)

In addition, Defendant was charged with and convicted of receipt and possession of child pornography.  (Id. at 5.)  On April 30, 2015, he was sentenced to 180 months' imprisonment,

---

[1]   Section 2G2.2, App. Note 6(B)(ii) of the United States Federal Sentencing Guidelines provides that each video shall be considered to have 75 images.  Therefore, the fifteen videos Defendant possessed is the equivalent of 1,125 child pornography images.

followed by ten years of supervised release.  (Id.)  The Court ordered his twelve-month sentence to be served consecutively with his 180-month sentence.  (Id. at 4-5.)  Defendant therefore is serving a total sentence of 192 months' imprisonment.  (Id.)  When the Government filed its Response to the compassionate release Motion, Defendant had served approximately eighty-five months[2]—roughly 40%—of his total sentence.  (Id. at 5.)  He is serving his sentence at the Federal Correctional Institution at Fort Dix, New Jersey ("FCI Fort Dix"), and has no disciplinary infractions.  (Id.)

### B.  Defendant's Expedited/Emergency Motion to Reduce Sentence

On April 28, 2020, Defendant sent a request for compassionate release to home confinement ("April Request") to the Warden at FCI Fort Dix.  (Doc. No. 27, Ex. B at 30-31.) On May 3, 2020, the Warden responded to the April Request by directing Defendant to resubmit his request with specifications on the legal grounds for his requested relief.  (Id. at 32.)  On May 14, 2020, Defendant resubmitted his request with the required specifications ("May Request"). (Id., Ex. C at 34-35.)  On May 18, 2020, the Warden sent another response to Defendant asking that he provide further specifications on his purported extraordinary and compelling reasons for release and detailing his release plan.  (Id. at 36.)  Defendant did not respond to this second request.  (Doc. No. 30 at 6.)

On July 13, 2020, Defendant filed the instant Expedited/Emergency Motion to Reduce Sentence under § 3582(c)(1)(A), requesting that his sentence be modified to time served or,

---

[2]   Defendant has served approximately seventy-four months of his sentence and has received good conduct credit of approximately eleven months, for a total of eighty-five months.  (Doc. No. 30 at 5.)

alternatively, that he be released to home confinement for the remainder of his sentence.[3]  (Doc. No. 27 at 1.)  Defendant contends that his underlying health conditions and the conditions at FCI Fort Dix place him at an increased risk of harm from COVID-19 and amount to extraordinary and compelling circumstances justifying his release.  (Id. at 2-4, 9-10.)  Defendant supports his argument with both recent cases where compassionate release due to COVID-19 was granted to defendants serving sentences for similar crimes and evidence of his personal behavior before and during his incarceration.  (Id. at 12-13, 15.)  On October 30, 2020, Defendant filed a Reply (Doc. No. 35) to the Government's Response in Opposition of Defendant's Motion.  (Doc. No. 30.)  On November 4, 2020, he also submitted an additional letter updating the Court on a recent increase in COVID-19 cases at FCI Fort Dix.  (Doc. No. 36.)

First, Defendant submits that his medical history of asthma, hypertension, obesity, depression, anxiety disorder, nerve damage, and hyperlipidemia[4] are correlated with increased hospitalization and fatality for COVID-19 patients, placing him at a risk of serious complications and possible death if he were to contract COVID-19.  (Doc. No. 27 at 3, 11-12; Doc. No. 35 at 6-7.)  Additionally, Defendant notes that he suffers from anxiety due to concerns about coming into contact with someone who "could be carrying his death sentence. . . ."  (Doc. No. 27 at 13-14.) Defendant attached to his Motion as Exhibit D a BOP Health Services Clinical Encounter record

---

[3]  Although Defendant titled his Motion as an "Expedited/Emergency Motion to Reduce Sentence," it may similarly be classified as a motion for compassionate release.

[4]  The Society for Vascular Surgery describes hyperlipidemia as an "umbrella term" that describes conditions with elevated levels of lipids—fats, cholesterol, and triglycerides—in a person's blood.  Gregory Moneta, Hyperlipidemia, SOCIETY FOR VASCULAR SURGERY (last accessed Nov. 9, 2020), https://vascular.org/patients/vascular-conditions/hyperlipidemia. Hyperlipidemia increases a person's "risk of developing atherosclerosis (hardening of the arteries), which can lead to stroke, heart attack[,] and the need to amputate."  Id.

(the "Well Visit Record")[5] as evidence of his purported conditions.  (See id., Ex. D.)  Defendant also claims his family history of Parkinson's Disease, pancreatic cancer, and coronary disease increase his comorbidity risk level should he contract COVID-19.  (Id. at 3-4.)

While Defendant did not elaborate on his health conditions in his Motion, the Well Visit Record and his Reply describe Defendant's conditions in greater detail.  (See id., Ex. D; Doc. No. 35.)  The Well Visit Record states that Defendant has unspecified bronchial asthma; this condition precipitates with exercise; he was prescribed an Albuterol inhaler for use as needed every four hours; and he was prescribed Mometasone Furoate for use twice daily.  (Doc. No. 27, Ex. D at 38, 43-44.)  Furthermore, Defendant is counseled to perform moderate exercise for 150 hours per week to prevent weight gain and make healthy lifestyle changes.  (Id. at 44.)

Next, the Well Visit Record states that on the day of his visit, Defendant had a high systolic blood pressure reading, and in his Reply, he claims he is obese because he has a Body Mass Index ("BMI") of 27 kg/m$^2$.  (Id. at 38, 40; Doc. No. 35 at 6.)  The Record notes that Defendant suffers from both anxiety and depression, takes medication for these conditions, presents with appropriate mood and affect, demonstrates goal-directed thought content, and is counseled to continue his current course of treatment for these conditions.  (Doc. No. 27 at 38, 42.)  It also mentions Defendant's hyperlipidemia, noting he had a cardiovascular disease ("CVD") score of 6.5%, a high-density lipoprotein level of 69 mg/dL, a low-density lipoprotein level of 82 mg/dL, and that he is not on a statin.  (Id. at 38, 44.)  Finally, the Well Visit Record

---

[5]   The BOP Health Services Clinical Encounter record for a June 29, 2020 visit is the only medical record Defendant included in his Motion.  This record is referred to as Defendant's "Well Visit Record" because it indicated that Defendant presented to the clinic for a routine follow-up appointment.  (Doc. No. 27, Ex. D at 38.)  Defendant did include another medical record in his Reply; however, this record is from 2015 and only reinforces the medical information provided in the Well Visit Report.  (Doc. No. 35, Ex. 1.)

states that Defendant suffered nerve damage from a bicycle fall, has intermittent numbness and pain in his left arm, and has not experienced worsening or new symptoms.  (Id. at 38.)

Second, Defendant believes that the conditions at FCI Fort Dix place him at a higher risk of contracting COVID-19 while incarcerated than if he were released to his home community. (Id. at 5, 9-10.)  Defendant supports his contention with evidence of COVID-19 outbreaks at other federal prisons, arguing that these cases indicate FCI Fort Dix could become a "death trap" for Defendant.  (Id. at 4-5.)  He claims FCI Fort Dix places inmates at a risk of potential COVID-19 exposure, as testing occurs in central facilities, quarantined inmates are permitted to interact with other inmates through open windows, staff members interact with quarantined and non-quarantined inmates, a mask mandate is no longer enforced, and, as of the date that Defendant filed his Motion, four additional FCI Fort Dix inmates had recently tested positive for COVID-19.  (Id. at 9-10.)  Defendant supports his claims with the Declaration of Dr. Joe Goldman, M.D., attached to his Motion as Exhibit A, which discusses the risks of COVID-19 in detention facilities and concludes that persons have a higher chance of contracting COVID-19 while at FCI Fort Dix than if they were in their home communities.  (Id., Ex. A at 22-27.)  Defendant also notes that his medical conditions have been exacerbated by substandard medical care during his incarceration.  (Id. at 3, 14-15.)

Third, Defendant supports his request with evidence that similarly situated defendants were granted compassionate release and that his personal behavior before and during his incarceration warrant such release.  (Id. at 12-13, 15.)  He provides examples of courts granting compassionate release for individuals convicted of child pornography offenses, including one case involving a recidivistic defendant.[6]  (Id. at 12-13.)  Defendant admits that his initial offense

---

[6]   Specifically, Defendant cites:

was both a serious and recidivistic crime, but opines that he has worked to rehabilitate himself during his incarceration by attending sex offender therapy, which he plans to continue should the Court grant his Motion.  (Id. at 12, 15-16.)  Defendant supports his rehabilitation claim with evidence that he has completed over six years of his sentence without disciplinary action, his extensive education record while incarcerated, his service as both a Religious Services employee and member of the Suicide Watch team for Psychological Services at FCI Fort Dix, and personal assurances that he will abide by any restrictions of his release.  (Id. at 15-17.)

### C.  The Government's Response to Defendant's Motion

On September 28, 2020, the Government filed a Response to Defendant's Motion.  (See Doc. No. 30.)  In its response, the Government first acknowledges that Defendant exhausted his statutory requirement under § 3582(c)(1)(A)(i), as over thirty days had passed from the Warden's receipt of Defendant's May Request.   (Id. at 6.)   However, the Government argues that Defendant's Motion should be denied because he has not shown an extraordinary and compelling reason to justify his release, and he poses an ongoing and significant danger to the community.  (Id. at 1.)   The Government also supplements its argument with a discussion of the BOP's response to the COVID-19 pandemic.  (Id. at 7-12.)

---

United States v. Sawicz, 2020 U.S. Dist. LEXIS 6448, 08-cr-287 (E.D.N.Y., Apr. 2020) [sic]. . . .  See, eg. United States v. Dillard, 2020 LEXIS 90865, 1:15-cr-00170 (E.D. Idaho, Apr. 2020) [sic]; United States v. Pagliuca, 2020 U.S. LEXIS 86932, 17-cr-432(CS) (S.D.N.Y., May 2020) [sic]; United States v. Musumeci, U.S. LEXIS 74699, 07-cr-402(RMP) (S.D.N.Y., Apr 2020) [sic]; United States v. Fishman, U.S. LEXIS 78157, 16-cr-00246, (N.D. Cal., May 2020) [sic].

(Doc. No. 27 at 12-13.)  Defendant notes that the Sawicz case involved a recidivistic defendant convicted of child pornography offenses.  (Id.)

Initially, the Government submits that none of Defendant's underlying health issues rise to an extraordinary and compelling reason for his release, as none of his purported conditions are listed by the Centers for Disease Control and Prevention ("CDC") as actual COVID-19 risk factors. (Id. at 15.) Specifically, the Government notes that, although moderate to severe asthma and hypertension are classified as potential COVID-19 risk factors, Defendant has failed to sufficiently delineate that these conditions constitute extraordinary and compelling reasons for his release. (Id. at 17-21.) The Government argues that Defendant's medical records indicate a "mild and intermittent" asthma condition as he is moderately prescribed Albuterol, only recently received a second prescription for Mometasone Furotate, is not subject to any activity restrictions, and is not recommended for any follow up consultations. (Id. at 18.)

Similarly, the Government avers that Defendant's records do not indicate that he has pulmonary hypertension and, instead, only received one high systolic blood pressure reading during his last well visit.[7] (Id. at 19.) The Government supports this averment by noting that Defendant has never been diagnosed with pulmonary hypertension, has not been ordered to undergo testing nor prescribed medication for hypertension, and has been directed only to monitor his blood pressure every few weeks. (Id.) Alternatively, the Government argues that even if Defendant does have hypertension, this would not warrant compassionate release if his condition can be managed during incarceration. (Id.)

The Government also notes that, unlike asthma and hypertension, the CDC does not categorize anxiety disorder, depression, or hyperlipidemia as either actual or potential COVID-19 risk factors. (Id. at 21-22.) The Government asserts that Defendant's anxiety and depression are not extraordinary and compelling reasons for his release because he is not prescribed

---

[7]   Defendant's Well Visit Record reports his blood pressure as 152/70 on June 29, 2020. (Doc. No. 27, Ex. D at 41.)

medication for these conditions, was described as having "appropriate mood and affect[,] . . . [with] goal-directed thought content" at his most recent well visit, and was counseled to continue with his current course of treatment.[8]   (Id. at 21.)   Furthermore, Defendant does not have a serious heart condition as his recent cardiovascular disease ("CVD") risk score placed him in the lowest risk category for developing CVD and, during his last well visit, he was not prescribed medication, a follow-up visit, or specialty care.[9]   (Id. at 22-23.)   The Government does not address Defendant's nerve damage condition.[10]

Next, the Government argues that the BOP has enacted precautions to prevent the spread of COVID-19 in FCI Fort Dix, such as: implementing social distancing, hygienic and cleaning protocols, quarantining and treating symptomatic and new inmates, limiting group gatherings and inmate movement among facilities, daily staff temperature checks and mandatory self-reporting of symptoms, and prohibiting social visits.   (Id. at 7-9.)   At the time of its Response, the Government conceded that one inmate was currently infected with COVID-19, thirty-five

---

[8]   Defendant's current treatment includes participation in a stress management course and referral to the psychiatric department to consider partaking in a cognitive behavioral therapy ("CBT") course.   (Doc. No. 30 at 21.)

[9]   Defendant does not provide in his Motion further explanation of his "CVD risk" percentage mentioned in his Well Visit Record.   (See Doc. No. 27.)   Although the Government indicates Defendant's 6.5% CVD risk places him in the lowest CVD risk category, the Government's referral to the Cleveland Clinic's website does not provide a definitive definition of a "CVD risk" score.   (Doc. No. 30 at 23.)   The Well Visit Record indicates that Defendant's 6.5% risk score correlates with a "10 year CVD risk."   (Doc. No. 27, Ex. D at 44.)   The cited Cleveland Clinic webpage provides a global risk score ("GRS") that determines a patient's risk of having a heart attack within ten years.   Blood Tests to Determine Risk of Coronary Artery Disease, CLEVELAND CLINIC (Sept. 30, 2019), https://my.clevelandclinic.org/health/diagnostics/16792-blood-tests-to-determine-risk-of-coronary-artery-disease.   It is uncertain whether the GRS score and the Well Visit Record's CVD risk score are equivalent; however, if they are equivalent, then Defendant's 6.5% risk score would place him in a low risk category.   Id.

[10]   The Government also has not addressed Defendant's claim of obesity because Defendant first raised this issue in his Reply to the Government's Response to his Motion.   (Doc. No. 35.)

inmates previously had COVID-19, and there had not been any deaths from COVID-19 at the facility.[11]  (Id. at 11.)

Finally, the Government asserts that the 18 U.S.C. § 3553(a) sentencing factors and Defendant's potential danger to the community weigh in favor of his continued confinement.[12] (Doc. No. 30 at 23.)  The Government claims that Defendant continues to present a risk of danger to the community, specifically to children, due to his criminal and recidivistic history and should serve the time remaining on his sentence.[13]  (Id. at 23, 25.)  Additionally, the Government

---

[11]  Presently, 232 inmates and fifteen staff members at FCI Fort Dix have the virus, forty-one inmates and six staff members have recovered from the virus, and there have not been any inmate deaths.  See COVID-19 Cases, FEDERAL BUREAU OF PRISONS (Nov. 13, 2020), https://www.bop.gov/coronavirus/.

[12]  When modifying a sentence under 18 U.S.C. § 3582(c)(1)(A), a court must consider the relevant sentencing factors set forth in 18 U.S.C. § 3553(a), which include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]
>
> . . . [and]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]

[13]  The Government similarly notes that Defendant's "managed medical condition" also shows that release would be inappropriate; however, in light of the seven enumerated medical

argues that Defendant has not demonstrated how his release, after serving just over seven years of his sixteen-year sentence, reflects the seriousness of the offense, promotes respect for the law, or provides just punishment for the offense.  (Id. at 25.)

## III.   DISCUSSION

### A. The Analytical Framework Regarding Motions for Compassionate Release Pursuant to § 3582(c)

Generally, a district court "may not modify a term of imprisonment once it has been imposed. . . ."  18 U.S.C. § 3582(c).  There are, however, "a few narrow exceptions" to this general "rule of finality[,]" Freeman v. United States, 564 U.S. 522, 526 (2011), including the compassionate release statute, § 3582(c)(1)(A). As amended by the recently enacted First Step Act, § 3582(c)(1)(A) empowers a district court to modify a term of imprisonment on a defendant's motion after the defendant has exhausted his administrative remedies.[14]  § 3582(c)(1)(A)(i).  The statute provides, in part, that a court:

> may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that

---

conditions Defendant has presented, it is uncertain the specific medical condition the Government refers to.  (Doc. No. 30 at 25.)

[14]  A defendant may file a motion for compassionate release directly with a district court after he "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. . . ."  18 U.S.C. § 3582(c)(1)(A). In other words, before a defendant can make such a request to the Court, he "must at least ask the Bureau of Prisons (BOP) to do so on [his] behalf and give [the] BOP thirty days to respond[,]" United States v. Raia, 954 F.3d 594, 595 (3d Cir. 2020), and if the BOP does respond adversely within the thirty days, to then exhaust any available administrative appeals during that period.  See § 3582(c)(1)(A).

Here, Defendant met the exhaustion requirement.  On May 14, 2020 he sent his May Request to the Warden at FCI Fort Dix, to which the Warden responded on May 18, 2020.  (Doc. No. 27, Ex. B-C.)  On July 13, 2020, he filed his Expedited/Emergency Motion to Reduce Sentence.  (See id. at 1.)  Additionally, the Government has stipulated in its Response that Defendant has exhausted the statutory requirement.  (Doc. No. 30 at 6.)

> does not exceed the unserved portion of the original term of
> imprisonment), after considering the factors set forth in [§ 3553(a)]
> to the extent that they are applicable, if it finds that—
>
> > (i)  extraordinary and compelling reasons warrant such a
> > reduction; . . .
>
> and that such a reduction is consistent with applicable policy
> statements issued by the Sentencing Commission[.]

§ 3582(c)(1)(A).  Congress, however, has not defined the term "extraordinary and compelling

reasons," except to the extent that "[r]ehabilitation of the defendant alone" is insufficient to

constitute an extraordinary and compelling reason.  28 U.S.C. § 994(t).  Instead, Congress

delegated the authority to define "extraordinary and compelling reasons" to the United States

Sentencing Commission.  Section 1B1.13 of the Sentencing Guidelines explains that a sentence

reduction under § 3582(c)(1)(A) may be ordered where a court determines:

> [A]fter considering the factors set forth in 18 U.S.C. § 3553(a), . . .
> that—
>
> > (1)  (A)  Extraordinary and compelling reasons warrant the
> > reduction; . . .
> >
> > (2)  the defendant is not a danger to the safety or any other
> > person or to the community, as provided in 18 U.S.C. §
> > 3142(g); and
> >
> > (3)  the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

Application Note 1 to section 1B1.13 discusses the meaning of "extraordinary and

compelling reasons," and lists three specific qualifying circumstances: (1) a defendant's medical

condition, (2) age, or (3) family circumstances.  § 1B1.13, App. Note 1(A)-(C).  This Note states:

> Provided the defendant [is not a danger to the safety of any person
> or to the community], extraordinary and compelling reasons exist
> under any of the circumstances set forth below:

(A) Medical Condition of the Defendant

   (i)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amytrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

   (ii)   The defendant is—

      (I)    suffering from a serious physical or mental condition,

      (II)   suffering from a serious functional or cognitive impairment, or

      (III)  experiencing deteriorating physical or mental health because of the aging process,

     that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant. The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family circumstances.

   (i)    The death or incapacitation of the caregiver of the defendant's minor child or minor children.

   (ii)   The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

§ 1B1.13 n.1(A)-(C).  Application Note 1 further provides a "catch-all" provision, which allows a court to modify a sentence for "extraordinary and compelling reason[s] other than, or in combination with, the reasons described in subdivisions (A) through (C)."  § 1B1.13 n.1(D).[15]

The Application Notes only provide "helpful guidance" and are "not ultimately conclusive. . . ."  United States v. Rodriguez, 451 F. Supp. 3d 392, 398 (E.D. Pa. 2020) (quoting United States v. Fox, No. 14-03, 2019 U.S. Dist. LEXIS 115388, at *5 (D. Me. July 11, 2019)). Since the Sentencing Commission has not yet amended section 1B1.14 or its commentary to account for the First Step Act, a district court has the authority to independently assess whether there are extraordinary and compelling reasons warranting a sentence reduction under § 3582(c)(1)(A).  See Rodriguez, 451 F. Supp. 3d at 395.

In general, however, "[i]n the context of the current global pandemic, [c]ourts around the country have [only] granted compassionate release where the defendant suffers from a serious condition that increases the likelihood of severe consequences from COVID-19."  United States v. Sommerville, 463 F. Supp. 3d 585, 596 (W.D. Pa. 2020) (quoting United States v. Brooks, No. 07-20047, 2020 U.S. Dist. LEXIS 85671, at *14 (C.D. Ill. May 15, 2020)) (internal quotation omitted).  In the Third Circuit, this means that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release. . . ."  United States v. Raia, 954 F.3d 594, 597 (3d Cir. 2020).  In addition, "[m]ost, though not all, of the cases where compassionate release has been granted also involved some showing that COVID-19 is actually present, usually to a significant degree, in the facility

---

[15] Although by its express language section 1B1.13 applies to motions brought by the Director of the BOP, the current consensus is that the First Step Act removed this requirement.  See generally United States v. Rodriguez, 451 F. Supp. 3d 392, 398 (E.D. Pa. 2020) (considering whether a defendant bringing a direct-to-court motion for compassionate release demonstrated "extraordinary and compelling reasons" and using section 1B1.13 as "helpful guidance.").

where the prisoner is incarcerated." <u>Sommerville</u>, 463 F. Supp. 3d at 596.  Thus, "a prisoner seeking release due to COVID-19 must at least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held." <u>Id.</u> at 596-97.

If a district court determines that an extraordinary and compelling reason exists, it must then weigh that reason against the § 3553(a) factors to determine if a sentence reduction is warranted and, if so, the extent of such reduction.  <u>See id.</u> at 588 (explaining that "the Court must weigh [the] extraordinary circumstances against the ordinary sentencing factors under 18 U.S.C. § 3553(a)."). § 3553(a), however, establishes factors for a court to consider in initially imposing a sentence; thus, not every factor is apropos when considering motions for compassionate release.  In the instant case, the applicable factors are:

> (1)  the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)  the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]
>
> . . . [and]
>
> (6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]

§ 3553(a)(1)-(2), (6).   Therefore, if a balance of a defendant's extraordinary and compelling reasons with the § 3553(a) factors support a reduced sentence, and that reduction is consistent with applicable policy statements of the Sentencing Commission, a court may reduce a defendant's prison term, modify the terms of supervised release, or both.

### B.   Defendant's Expedited/Emergency Motion to Reduce Sentence Will Be Denied

Defendant's Motion will be denied because he has not shown an extraordinary and compelling reason for his release.   Further, the relevant § 3553(a) factors weigh against a reduction or modification of his sentence.[16]   Each of these conclusions is discussed seriatim.

### 1.   Defendant's Medical Conditions Do Not Present Extraordinary and Compelling Reasons for His Release

Defendant has not established the required particularized vulnerability to COVID-19 and its effects required to constitute extraordinary and compelling reasons for his release.   Defendant also has not established that he suffers from sufficiently serious medical conditions that place him at a uniquely high risk of illness or death if he were to contract COVID-19, even though he has shown that the existence of COVID-19 at FCI Fort Dix is more than merely speculative.[17]

---

[16]   Because the Court will deny Defendant's Motion for the reasons given, and will not reduce his sentence, it is not necessary to determine whether a reduction in Defendant's sentence would be consistent with applicable policy statements of the Sentencing Commission.

[17]   There is an actual, non-speculative risk of contracting COVID-19 at FCI Fort Dix.   In Defendant's Motion, filed on July 13, 2020, he asserts that four inmates had recently tested positive for COVID-19.   (Doc. No. 27 at 10.)   However, in the Government's response, filed on September 28, 2020, the Government claimed that only one inmate had COVID-19, and thirty-five had recovered.   (Doc. No. 30 at 11.)   As of the filing of this Opinion, 232 inmates and fifteen staff members have tested positive for COVID-19.   COVID-19 Cases, FEDERAL BUREAU OF PRISONS (Nov. 13, 2020), https://www.bop.gov/coronavirus/.   These current numbers "are based on the most recently available confirmed lab results involving open cases. . . ." Id. (emphasis omitted).   Given this increase in confirmed cases, COVID-19 is present, to a significant degree, at FCI Fort Dix.   However, the Court notes that the Bureau of Prisons has implemented precautions to quarantine infected and symptomatic inmates to contain the virus's spread.   (Doc. No. 30 at 7-9.)

### a.  Defendant's Asthma, Hypertension, and Alleged Obesity Do Not Warrant His Compassionate Release

Defendant's medical conditions are not severe enough to warrant compassionate release because his conditions do not place him at an especially high risk of serious illness or death if he were to contract COVID-19.   Defendant asserts that he suffers from asthma, hypertension, obesity, depression, anxiety disorder, nerve damage, and hyperlipidemia.   (Doc. No. 27 at 3; Doc. No. 35 at 6-7.)  Of Defendant's alleged conditions, the CDC has classified only moderate to severe asthma, hypertension, and obesity as actual or potential COVID-19 risk factors, and Defendant's other alleged conditions are not listed as actual or potential COVID-19 risk factors.[18]   Michigan Medicine at the University of Michigan classifies asthma as moderate or severe if symptoms occur daily, short-acting asthma medication is used daily, symptoms interfere with daily activities, nighttime symptoms occur more than once per week, or the patient's lung function tests are abnormal. Classification of Asthma, UNIVERSITY OF MICHIGAN (June 9, 2019), https://www.uofmhealth.org/health-library/hw161158.  Furthermore, the CDC notes that a Body Mass Index ("BMI") of 30 kg/m$^2$ or greater—which constitutes obesity—is an actual COVID-19 risk factor, while BMI between 25-30 kg/m$^2$—which constitutes being overweight—is only a

---

[18]   The Court has considered the CDC's guidance on conditions that increase an individual's risk of severe illness from COVID-19.   See People with Certain Medical Conditions, CENTERS FOR DISEASE CONTROL AND PREVENTION (Oct. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  In its most recent guidance, the CDC outlines two categories of risk factors. The first category includes conditions that will increase an individual's risk of experiencing severe illness from COVID-19.  The second category is more tenuous.  It includes conditions that may increase an individual's risk of severe illness.  Of Defendant's alleged medical conditions, only his asthma and hypertension are listed in the latter category of potential risk factors.  See id. Obesity is listed in the first category as an actual risk factor; however, Defendant has only shown that he is overweight and not obese. See id. Defendant's other conditions—depression, anxiety disorder, nerve damage, and hyperlipidemia—are not listed in either category.  See id. The CDC's guidance, however, is not binding on this Court and, in any event, there is no showing that his conditions substantially diminish his ability to provide self-care at FCI Fort Dix.

potential risk factor.  People with Certain Medical Conditions, CENTERS FOR DISEASE CONTROL

AND PREVENTION (Oct. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

precautions/people-with-medical-conditions.html.

District courts have routinely denied motions for compassionate release based on

allegations of only potential COVID-19 risk factors, including asthma and hypertension.  See,

e.g., United States v. Daniels, No. 15-127, 2020 WL 4674125, at *3 (E.D. Pa. Aug. 12, 2020)

(noting defendant's use of Albuterol inhaler does not preclude possible normal lung function);

United States v. Yanney, No. 15-298, 2020 U.S. Dist. LEXIS 116480, at *13 (M.D. Pa. July 2,

2020) (finding defendant's adequately managed hypertension insufficient to qualify as an

extraordinary and compelling reason for compassionate release);  United States v. Towel, No. 17-

519-6, 2020 WL 2992528, at *4-5 (E.D. Pa. June 4, 2020) (determining mild, exercise-induced

asthma not a COVID-19 risk factor);  United States v. Falci, No. 17-228, 2020 U.S. Dist. LEXIS

108498, at *12-14 (D.N.J. June 22, 2020) (denying compassionate release where the defendant

suffered from hypertension because "[t]here is no indication that Defendant suffers from

pulmonary hypertension or any other 'serious heart condition' that the CDC has identified as a

high-risk factor.")

Here, Defendant alleges that he suffers from three actual or potential COVID-19 risk

factors: asthma, hypertension, and obesity.  (Doc. No. 27 at 3; Doc. No. 35 at 6-7.)  With respect

to asthma and hypertension, these medical conditions appear to be under control.  Defendant has

supported his claims of suffering from these two conditions with only the Well Visit Record,[19]

which describes Defendant's asthma classification as unspecified.  (Doc. No. 27, Ex. D sat 43.)

_____

[19]  Defendant has not supplemented his Well Visit Record with additional descriptions of these
two conditions in his Motion.  (See Doc. No. 27.)  In his Motion, Defendant merely asserts he
suffers from these conditions, alludes to his attached medical records, and notes his subjective
displeasure with the treatment he has received while incarcerated.  (Id. at 2-3, 11-12, 14-16.)

Although the Well Visit Record does state Defendant uses asthma medication daily, an indication that he may have moderate to severe asthma, his present treatment and the Well Visit Record physician's exercise recommendation show that Defendant's asthma condition is under control. (Id. at 38, 43-44.)  Regarding his claim of hypertension, the Well Visit Record makes note of Defendant's high systolic blood pressure reading during the June 2020 visit, but the physician neither diagnosed Defendant as hypertensive nor recommended any course of treatment to remedy this reading.  (Id. at 38, 40.)  Finally, although Defendant claims he is obese, he is only overweight and has been counseled to make lifestyle changes to reduce his weight.[20]  (Id. at 44; Doc. No. 35 at 17.)  In sum, Defendant's asthma, hypertension, and purported obesity appear to be under control.  Thus, these conditions do not establish extraordinary and compelling reasons warranting his compassionate release.

### b.  Defendant's Other Conditions Do Not Warrant Compassionate Release

Similarly, Defendant's other claimed medical conditions—depression, anxiety disorder, hyperlipidemia, and nerve damage—do not present extraordinary and compelling reasons justifying his release.  The CDC has not classified Defendant's other conditions as either actual or potential COVID-19 risk factors.[21]  People with Certain Medical Conditions, supra.

---

[20]  Although Defendant claims he is obese because he has a BMI of 27 $kg/m^2$, the CDC only considers a person obese if he or she has a BMI of at least 30 $kg/m^2$.  People with Certain Medical Conditions, CENTERS FOR DISEASE CONTROL AND PREVENTION (Oct. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  Because Defendant does not have a BMI of at least 30 $kg/m^2$, he is not considered to be obese.

[21]  The research Defendant presents in support of his conditions does not mention depression, anxiety disorder, nerve damage, or hyperlipidemia as COVID-19 risk factors or comorbidities.  See Safiya Richardson, et al., Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area, JAMA, Apr. 22, 2020, 2020;323(20):2052-2059.

Defendant's description of his remaining conditions is limited to the Well Visit Record.  (See Doc. No. 27.)

All four conditions appear to be under control.  Defendant was directed to continue his current course of mental health treatment for his depression and anxiety disorder, was not counseled to severely modify his lifestyle due to his hyperlipidemia, and was not counseled on his nerve damage.[22]  (Id. at 44.)  Defendant has not shown how these four conditions specifically put him at a significant risk should he contract COVID-19.  Thus, because these four conditions are neither actual nor potential COVID-19 risk factors, appear to be under control, and do not appear to substantially diminish his ability to provide self-care, these conditions are not sufficiently extraordinary and compelling to warrant Defendant's release.[23]

### 2. The § 3553(a) Sentencing Factors Do Not Weigh in Favor of Defendant's Release

Finally, the relevant § 3553(a) factors support neither Defendant's release to home confinement nor a sentence reduction.  First, the Court has examined the nature and circumstances of the offense and Defendant's history and characteristics.  See § 3553(a)(1). Defendant admits that his initial offense was both a serious and recidivistic crime.  (Doc. No. 27 at 12.)  Indeed, the United States Supreme Court has commented on the severity of child pornography offenses in noting, "[c]hild pornography harms and debases the most defenseless of

---

[22] Defendant was directed to make "[h]ealthy lifestyle changes," which could be in relation to his alleged hyperlipidemia.  (Doc. No. 27, Ex. D at 44.)  However, no other facts indicate that Defendant was advised to seek additional treatment for his hyperlipidemia. This modest lifestyle change can be made without medical intervention and while incarcerated.

[23] Defendant's reliance on a family history of Parkinson's Disease, pancreatic cancer, and coronary disease are equally unpersuasive to warrant compassionate release.  (Doc. No. 27 at 3-4.)  Defendant does not allege that he suffers from these conditions.  Moreover, he does not suffer from a terminal illness, and his age and family circumstances do not warrant his release.

our citizens."  United States v. Williams, 553 U.S. 285, 307 (2008).  Furthermore, Defendant committed the actions for which he is currently serving his sentence while on supervised release for similar conduct.  (Doc. No. 30 at 1-5.)  As such, he has shown a tendency to continue his criminal activity upon his release from custody.[24]

The Court has also considered whether his release would reflect the seriousness of the offenses, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes by him.  § 3553(a)(2)(A)-(C).  Defendant has served less than two-thirds of a sixteen-year sentence.[25]  The magnitude of Defendant's crimes warrant the sentence he received.  Although he asserts he "will abide by any and all restrictions placed on him by the Court[,]" his release at this point would neither reflect the seriousness of his offenses, promote respect for the law, provide just punishment, afford adequate deterrence, nor protect the public from further crimes Defendant may commit.  (Doc. No. 27 at 16.)

Lastly, the Court has considered the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.   §

---

[24] Defendant notes that, during his sentencing, Dr. Christopher Lorah suggested Defendant rehabilitate himself through therapy.  (Doc. No. 27 at 12.)  Additionally, Defendant alludes to undertaking sex offender therapy with Dr. Lorah; however, he has not provided any specific details of this therapy that suggest he will not recidivate should his Motion be granted.  (See id. at 16.)

[25] In United States v. Pawlowski, 967 F.3d 327, 331 (3d Cir. 2020), the Third Circuit held the following regarding 18 U.S.C. § 3553(c)(1)(A) and its requirement that a court reviewing a motion for compassionate release consider the § 3553(a) factors to the extent they are applicable:

> Because a defendant's sentence reflects the sentencing judge's view of the § 3553(a) factors at the time of sentencing, the time remaining in that sentence may—along with the circumstances underlying the motion for compassionate release and the need to avoid unwarranted disparities among similarly situated inmates— inform whether immediate release would be consistent with those factors.

3553(a)(6).  Defendant received a sentence within the range set by the Sentencing Guidelines, which Congress created to specifically address sentencing disparities.  To reduce Defendant's sentence would not reflect the Sentencing Commission's goal of avoiding unwarranted sentence disparities among similarly situated defendants and ensuring consistent punishment for similar offenses.  Therefore, none of the applicable § 3553(a) factors favor either Defendant's release to home confinement or a sentence reduction.

## IV.     CONCLUSION

For the foregoing reasons, Defendant's Motion Expedited/Emergency Motion to Reduce Sentence (Doc. No. 27) will be denied.  An appropriate Order follows.